UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
CONNIE BROOKS, On behalf of the Estate :
of James Thomas Bell a/k/a James "Cool :        06 CIV. 2359 (DLC)
Papa" Bell,                            :
                    Plaintiff,         :        OPINION AND ORDER
                                       :
          -v-                          :
                                       :
THE TOPPS COMPANY, INC.,               :
                                       :
                    Defendant.         :
                                       :
-------------------------------------- X

Appearances:

For Plaintiff:

Susan Progoff
Victor Hendrickson
Ropes & Gray LLP
1211 Avenue of the Americas
New York, New York 10036

Clinton L. Conner
Ropes & Gray LLP
525 University Avenue
Suite 300
Palo Alto, California 94301

For Defendant:

David G. Ebert
Mioko C. Tajika
Ingram Yuzek Gainen Carroll & Bertolotti, LLP
250 Park Avenue
Sixth Floor
New York, New York 10177

DENISE COTE, District Judge:

    This case arises out of efforts by Connie Brooks ("Brooks")

to protect the legacy of her late father, celebrated baseball

1

player James Thomas Bell, also known as James "Cool Papa" Bell
("Bell").  Brooks, acting on behalf of Bell's estate, filed this
action on March 27, 2006.  She filed an amended complaint on
August 16, 2006, complaining that defendant Topps Company, Inc.
("Topps") had used Bell's "name, likeness, signature,
intellectual property rights, and publicity rights" without
authorization and had printed defamatory information about Bell.
Following discovery, Topps filed a motion for summary judgment
on June 1, 2007.  Brooks, who had initially proceeded pro se,
thereafter retained counsel, and the briefing schedule for the
motion was adjusted to permit incoming counsel to oppose the
motion.  For the following reasons, the motion is granted.

BACKGROUND

The facts that follow are undisputed or based on the
evidence viewed in the light most favorable to Brooks.  Bell
played, managed, coached, and scouted for the Negro Leagues from
1922 to 1950.  He was known for his speed, and his friend
Satchel Paige is said to have remarked that Bell was so fast he
could switch off the light and be in bed before the room was
dark.  Bell was inducted into the Baseball Hall of Fame in 1974.

After being inducted, Bell granted the National Baseball
Hall of Fame permission to use his name and likeness on various
products.  In 1989, he contracted with Gartlan USA, Inc., to

autograph cards that the company would sell along with figurines in his likeness. Following Bell's death, Brooks, as the executrix of his estate, granted commercial licenses to use Bell's name and images of him. In or around 1994 and 2001, Brooks licensed Bell's name to the Upper Deck Company ("Upper Deck") for use on baseball cards. In the 2001 agreement, she granted Upper Deck permission to use a particular image of Bell. From approximately September 17, 1993 through June 1, 1994, she licensed Bell's name and a particular image of him to Rodrigues Studio for use on clothing and prints. She also entered into a licensing agreement with General Mills to permit it to print Bell's name and likeness on Wheaties Boxes sold around February 1996. Around mid-1996, she licensed Bell's "name and likeness" to a company called Crown Crafts, for use on throw blankets.[1]

In 2001 and 2004, without authorization from Brooks, Topps released seven baseball cards depicting Bell. The following chart lists the cards that Topps produced, as they have been named by Topps.[2]

---

[1] Brooks has submitted some documentation to support the assertions regarding Rodrigues Studio.

[2] Brooks states in her Rule 56.1 Statement that some of the numbers in the table are contradicted by Topps' document production, but she does not explain how the exhibit she has cited supports this contention. In any event, the number of cards released in each series is not material to the holding below.

|  | Card | Release Date | Total Number of Cards in Series | Total Number of Bell Cards in Series |
|---|---|---|---|---|
| (1) | 2001 Topps Series II Baseball (base card) | April 16, 2001 | 51,800,000 | 34,800 |
| (2) | 2001 Topps Chrome (base card) | May 21, 2001 | 2,100,000 | 45,000 |
| (3) | 2001 Topps Chrome (refractor parallel card) | May 21, 2001 | This card was part of the same series as (2) above. | 5,000 |
| (4) | 2004 Topps Tribute Hall of Fame (base card) | November 1, 2004 | 217,000 | 2,170 |
| (5) | 2004 Topps Tribute Hall of Fame (gold parallel card) | November 1, 2004 | This card was part of the same series as (4) above. | 74 |
| (6) | 2004 Topps Tribute Hall of Fame (Cooperstown Cut Signature Card) ("2004 Signature Card") | November 1, 2004 | This card was part of the same series as (4) above. | 1 |
| (7) | 2004 eTopps Classic (base card) | August 2, 2004 to August 9, 2004 | N/A | 938 |

The terms "base card," "refractor parallel card," and "gold parallel card" refer to different styles of cards.

The 2001 cards contained the following description of how Bell acquired the nickname "Cool Papa": "Cool Papa, who once stole more than 175 bases in a 200-game season, earned his

nickname after falling asleep right before a game." Brooks asserts that this description is both false and derogatory.[3]

The 2004 cards featured the same image of Bell that Brooks had licensed to Upper Deck in or around 2001. The 2004 Signature Card included an image of Bell's signature. All of the cards in a series were randomly packaged and sold in sealed packs of cards except for the 2004 eTopps Classic card, which was sold individually on the internet. Topps did not sell any of the cards after the year in which they were released.

Topps issued promotional materials for both the 2001 and 2004 cards. The 2004 promotional materials contained two statements that Brooks notes in her opposition papers. One footnote in those materials stated in miniscule print that "[a]lthough these players have agreed to provide these cards for Topps, we cannot guarantee that all autographs . . . will be received in time for inclusion in this product." (Emphasis supplied) ("Player Agreement Footnote").[4] In the text, the same promotional materials state that "[t]his set delivers . . . Authentic Cut Signatures from celebrated Hall of Fame players," and that the cards "feature an authentic autograph from 1 of 186

_____

[3] Topps offers evidence that it took the description from the 1997 book Players of Cooperstown: Baseball's Hall of Fame, which was written by a baseball historian and six baseball writers and editors.

[4] A second footnote contains a similar disclaimer relating to a series of "Relic" cards.

Hall of Fame members." ("Autograph Statement"). These promotional materials list the names of a few of the players and picture a few autographed cards. Bell's name and signature do not appear on the promotional materials.

Topps's first contact with Brooks occurred in late 2004. Brian Koeberle ("Koeberle"), acting on behalf of Topps, contacted Brooks by telephone to ask if she would license her father's name and likeness for baseball cards to be published in 2005. At this time Brooks did not know, and Koeberle did not mention, that Topps had previously published seven cards depicting Bell. After several telephone conversations, Koeberle sent Brooks an unsolicited proposed license agreement. Under this draft, dated December 17, 2004, Topps would have paid Brooks $5,000 for the non-exclusive right to use Bell's name and image on its trading cards for the year 2005. Koeberle stated in the cover letter that Brooks had agreed in the telephone call to this offer, but she had not done so. Brooks rejected this agreement.

In early 2005, a friend told Brooks that Topps might have sold a Bell card. Brooks asked Topps about this. On February 15, 2005, she received a letter from Philip J. Carter ("Carter"), Director of Sports/Player Licensing at Topps, enclosing the 2004 eTopps card and one of the 2004 Tribute Hall of Fame cards and saying that Carter was still looking for other

cards Topps may have published depicting Bell.  Brooks called
Carter and told him she wanted Topps to stop engaging in any
conduct relating to Bell, requested compensation for the two
cards Topps had printed in 2004, and asked if Topps had printed
any other Bell cards.

In mid-2005, a friend of Brooks showed her one of the 2001
Topps Bell cards.  Brooks immediately contacted Carter, who
asked questions about the card and said he knew nothing about it
but would look into it.  In response to further inquiries from
Brooks, Carter said he was unable to find any information about
the 2001 card or any other Bell card.

On June 26, 2005, Topps offered Brooks $35,000 to sign a
settlement agreement and release of liability ("Settlement
Agreement").  She refused and asked again for an accounting of
all of the Bell cards Topps had published.

On December 27, 2005, Brooks wrote a letter to Carter
demanding a retraction of the erroneous Nickname Statement, a
luncheon in her father's honor, and full information about all
of the Bell cards Topps had published.  Carter responded by
offering to publish a correction of the Nickname Statement and
to discuss publishing another Bell card on condition that Brooks
sign the Settlement Agreement.

By letter dated January 31, 2006, Adam Zucker, Carter's
successor, provided Brooks with a list of "all cards of Cool

Papa Bell produced by Topps from 2001-2005." This list was
equivalent to the list printed above, except that the 2004
Signature Card was omitted and a 2004 Tribute Hall of Fame
"Refractor Parallel" card was listed in its place. Brooks filed
this lawsuit on March 27, 2006.


   DISCUSSION

   Brooks presses three causes of action in opposition to the
motion for summary judgment:[5] a Missouri common law right of
publicity claim, claims pursuant to Section 43(a) of the Lanham
Act, and a New York unfair competition claim.

I.   Right of Publicity

   The right of publicity claim arises under state common law.
To determine which state's law applies, a federal court
exercising supplemental jurisdiction over state law claims
applies the conflict-of-laws rules of the forum state. Rogers
v. Grimaldi, 875 F.2d 994, 1002 (2d Cir. 1989) (applying Oregon
publicity law). The parties agree that pursuant to these rules
Missouri law governs the right of publicity claim, because James
"Cool Papa" Bell was a resident of Missouri at the time of his
death. See id. (citing Southeast Bank, N.A. v. Lawrence, 489
N.E.2d 744 (N.Y. 1985) (personal property rights are governed by

_____

[5] Brooks explicitly withdraws her defamation claim.

law of decedents' domicile)).  They also agree that the statute

of limitations is governed by New York law, which provides the

shorter limitations period for right of publicity claims.  <u>See</u>

N.Y. C.P.L.R. § 202[6]; <u>see also</u> <u>Cantor Fitzgerald Inc. v. Lutnick</u>,

313 F.3d 704, 709-10 (2d Cir. 2002); <u>compare</u> N.Y. C.P.L.R. §

215(3)<u>and</u> <u>Zoll v. Jordache Enterprises, Inc.</u>, No. 01 Civ. 1339

(CSH), 2002 WL 31873461, at *7 (Dec. 24, 2002) <u>with</u> Mo. Ann.

Stat. § 516.120(4).

The relevant New York cause of action, an action for right

of publicity claims under Section 51 of the New York Civil

Rights Law, has a one-year statute of limitations.  <u>Zoll</u>, 2002

WL 31873461, at *7; <u>see</u> N.Y. C.P.L.R. § 215(3).  Under the

single publication rule, this limitations period runs from the

date of an offending item's publication, and "the dissemination

of that same offending item thereafter does not give rise to a

new cause of action, nor does it refresh the running of the

statute of limitations."  <u>Zoll</u>, 2002 WL 31873461, at *7.

The first publication of the most recent baseball card at

issue in this case occurred on November 1, 2004.  Brooks filed

her lawsuit more than one year later, on March 27, 2006.

---

[6] New York's borrowing statute requires the use of the shorter
statute of limitations when a non-resident files suit in a New
York court.  N.Y. C.P.L.R. § 202.  Both parties have consented
to the application of this rule despite the fact that it appears
that Brooks is, although her father was not, a resident of New
York.

Applying the single publication rule, her right of publicity claims are barred by the statute of limitations.

Brooks argues that the single publication rule should not apply in this case, because baseball cards that are distributed in sealed packages that do not identify the particular cards they contain are not "true publications." She argues that the discovery rule, under which the statute of limitations would run from the date on which she discovered or reasonably could have discovered the defendant's actions, should apply here. <u>See LaBarbera v. N.Y. Eye & Ear Infirmary</u>, 691 N.E.2d 617, 619 (N.Y. 1998). Brooks does not contend that New York courts have ever found that a right of publicity claim accrues upon discovery, but argues that it should be adopted here in order to avoid depriving her of "a reasonable chance to assert a valid claim."

The New York Court of Appeals has explained that

> Statutes of Limitation were designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. Other interests include promoting repose by giving security and stability to human affairs, judicial economy, discouraging courts from reaching dubious results, recognition of self-reformation by defendants, and the perceived unfairness to defendants of having to defend claims long past. These considerations must be balanced against the injured person's stake in having a reasonable opportunity to assert a claim.

<u>Covington v. Walker</u>, 819 N.E.2d 1025, 1028 (N.Y. 2004)

(citation omitted).  New York applies the discovery rule to
narrowly defined categories in which the legislature has
authorized the exception, including medical malpractice
claims that involve foreign objects left in a patient's
body after surgery, N.Y. C.P.L.R. § 214-a;[7] LaBarbera, 691
N.E.2d at 619-20, and toxic tort claims, N.Y. C.P.L.R. §
214-c; Germantown Cent. Sch. Dist. v. Clark, Clark, Millis
& Gilson, AIA, 791 N.E.2d 398, 400 (N.Y. 2003).  The New
York Court of Appeals has expressed reluctance to extend
the discovery rule without legislative authorization.
McCoy v. Feinman, 785 N.E.2d 714, 718 & n.2 (N.Y. 2002)
(citing N.Y. C.P.L.R. § 201[8]) (legal malpractice); see also

---

[7] This statute reads, in part:

> An action for medical . . . malpractice must be
> commenced within two years and six months of the act,
> . . . complained of . . . ; provided, however, that
> where the action is based upon the discovery of a
> foreign object in the body of the patient, the action
> may be commenced within one year of the date of such
> discovery or of the date of discovery of facts which
> would reasonably lead to such discovery, whichever is
> earlier.

N.Y. C.P.L.R. § 214-a (emphasis supplied).

[8] This section reads,

> An action . . . must be commenced within the time
> specified in this article unless a different time is
> prescribed by law or a shorter time is prescribed by
> written agreement.  No court shall extend the time
> limited by law for the commencement of an action.

Blanco v. Am. Tel. & Tel. Co., 689 N.E.2d 506, 513-14 (N.Y.
1997) (holding that personal injury claim arising from
repetitive stress injuries accrued at the time the
plaintiffs began experiencing symptoms, but not at the time
they discovered the nature of their injuries).

There being no basis to find that New York courts
would adopt a discovery rule to extend the statute of
limitations for a right of publicity cause of action,
Brooks's request for such an extension is rejected.[9]  Under
New York law, statutes of limitations "cannot be deemed
arbitrary or unreasonable solely on the basis of a harsh
effect."  Zumpano v. Quinn, 849 N.E.2d 926, 929 (N.Y.
2006).

Brooks next argues next that Topps should be estopped from
asserting a statute of limitations defense because it concealed
the existence of certain cards from her.

> The doctrine of equitable estoppel will bar the
> assertion of the affirmative defense of the statute of
> limitations where it is the defendant's affirmative
> wrongdoing which produced the long delay between the
> accrual of the cause of action and the institution of
> the legal proceeding.  The doctrine will apply where a
> plaintiff was induced by fraud, misrepresentations or

---

N.Y. C.P.L.R. § 201.

[9] The only jurisdiction that the plaintiff has cited that applied
a discovery rule to a privacy tort claim was California, see
Cain v. State Farm Mutual Automobile Insurance, 132 Cal. Rptr.
860, 863 (Cal. Ct. App. 1976), and there is no reason to believe
that its approach has been or would be adopted by New York.

> deception to refrain from filing a timely action.
> Significantly, equitable estoppel must be established
> by clear and convincing proof and a plaintiff's
> general accusations of deception not based on personal
> knowledge are insufficient.

Dombroski v. Samaritan Hosp., 2007 WL 4145144, at *1 (N.Y. Nov. 21, 2007) (citation omitted). A party asserting equitable estoppel must point to evidence that the opposing party's conduct "transcended mere negligence and amounted to an affirmative, intentional misrepresentation." Id. at *2. "Even where an intentional misrepresentation is thus established, to invoke the doctrine a plaintiff must demonstrate reasonable reliance on the defendant's misrepresentations and due diligence on the part of the plaintiff in bringing the action." Id. at *1.

Topps' first contact with Brooks occurred in late 2004, when it contacted her requesting a license to use her father's name and likeness on a 2005 card. During several phone calls and in a proposed licensing agreement faxed on December 7, Topps failed to disclose to Brooks that it had previously sold any Cool Papa Bell cards. Brooks may not prevail on her estoppel argument with respect to the 2001 cards, because the statute of limitations had already run with respect to those cards in late 2004. Ross v. Louise Wise Svcs., Inc., 868 N.E.2d 189, 8 N.Y.3d 478, 492 (2007).

December 7, 2004 was at least arguably within the
limitations period for the non-disclosed 2004 cards. There is
no evidence, however, that Topps made affirmative
misrepresentations to Brooks within one year of the date the
cards were published. See Dombroski, 2007 WL 4145144, at *1-2.
The only occasion on which a Topps representative told Ms.
Brooks that a list of cards he was providing included all of the
Bell cards was in January 2006, after the statute of limitations
on all of the underlying claims had already run. See Ross, 8
N.Y.3d at 492. Brooks has not raised a question of fact,
therefore, to support her contention that Topps may be estopped
from using the statute of limitations as a defense. Summary
judgment is granted to the defendant on the right of publicity
claims.

## II.  Lanham Act and Unfair Competition Claims

Brooks has also brought claims of:  (1) false endorsement
under Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. §
1125(a)(1)(A)[10] ("false endorsement claim"); (2) false

---

[10] Section 43(a)(1) of the Lanham Act provides that:

Any person who, on or in connection with any goods or
services, or any container for goods, uses in commerce
any word, term, name, symbol, or device, or any
combination thereof, or any false designation of
origin, false or misleading description of fact, or
false or misleading representation of fact, which--

advertising[11] under Section 43(a)(1)(B) of the Lanham Act, 15

U.S.C. § 1125(a)(1)(B) ("false advertising claim"); and (3)

unfair competition under New York common law ("common law unfair

competition claim").  In opposition to the motion for summary

judgment, she rests all of these claims upon her contentions

that she has used Bell's name and likeness as unregistered marks

and has a commercial interest in protecting them.  With regard

to the false endorsement claim, she alleges that the Player

Agreement Footnote and the Autograph Statement, contained in the

promotional materials for the series that included the 2004

Signature Card, were likely to confuse consumers into believing

---

      (A) is likely to cause confusion, or to cause
mistake, or to deceive as to the affiliation,
connection, or association of such person with
another person, or as to the origin,
sponsorship, or approval of his or her goods,
services, or commercial activities by another
person, or

      (B) in commercial advertising or promotion,
misrepresents the nature, characteristics,
qualities, or geographic origin of his or her
or another person's goods, services, or
commercial activities,

shall be liable in a civil action by any person who
believes that he or she is or is likely to be damaged
by such act.

15 U.S.C.A. § 1125(a)(1).

[11] Brooks frequently refers to this claim as "false
representation" but does not suggest that it should be governed
by a standard other than that of Section 43(b)(1)(B).

that she or Bell endorsed the 2004 Signature Card.[12]  With
respect to the false advertising claim, Brooks argues that both
the preceding statements and the Nickname Statement, which is
printed on the 2001 cards, were false and damaging to Bell's
name and image.  She relies on the same facts and legal theories
in support of her common law unfair competition claim.

     A.   False Endorsement under Section 43(a)(1)(A)

     To succeed on a false endorsement claim under Section
43(a)(1)(A), a plaintiff must prove:  (1) that she has a right
to use the mark; (2) that the mark is "distinctive as to the
source of the good or service at issue"; and (3) "that there is
the likelihood of confusion between the plaintiff's good or
service and that of the defendant."  ITC Ltd. v. Punchgini,
Inc., 482 F.3d 135, 154 (2d Cir. 2007).

     As a preliminary matter, it is necessary to identify the
marks at issue.  Brooks asserts that her claim is premised on
her rights in Bell's name and image.  A trademark is "any word,
name, symbol, or device, or any combination thereof which is
used or intended to be used by a person in commerce to identify
and distinguish his or her goods from those manufactured or sold
by others and to indicate the source of the goods, even if that
source is unknown."  Louis Vuitton Malletier v. Dooney & Bourke,

---

[12] Brooks appears to make this argument with respect to all of
the cards, but the only card to which the promotional statements
she cites refer is the 2004 Signature Card.

<u>Inc.</u>, 454 F.3d 108, 115-16 (2d Cir. 2006) (citing 15 U.S.C. §
1127). For an unregistered mark to be protectable under Section
43(a), the mark must either be "inherently distinctive, i.e.,
intrinsically capable of identifying its source," or have
"acquired secondary meaning." <u>Id.</u> at 116 (citation omitted).
Personal names and photographs are not inherently distinctive,
and therefore are "protected only if, through usage, they have
acquired distinctiveness and secondary meaning." <u>Pirone v.</u>
<u>MacMillan, Inc.</u>, 894 F.2d 579, 583 (2d Cir. 1990) (name and
photograph of baseball legend Babe Ruth).

"'Secondary meaning' is a term of art referencing a
trademark's ability to identify the source of the product rather
than the product itself." <u>ITC</u>, 482 F.3d at 167 (citation
omitted); <u>see</u> <u>Star Indus., Inc. v. Bacardi & Co. Ltd.</u>, 412 F.3d
373, 383 (2d Cir. 2005). Secondary meaning can be shown through
evidence that "the public is moved in any degree to buy an
article because of its source." <u>Genesee Brewing Co. v. Stroh</u>
<u>Brewing Co.</u>, 124 F.3d 137, 143 n. 4 (2d Cir. 1997) (citation
omitted). Factors that may be considered in determining whether
a mark has developed secondary meaning include "(1) advertising
expenditures, (2) consumer studies linking the mark to a source,
(3) unsolicited media coverage of the product, (4) sales
success, (5) attempts to plagiarize the mark, and, (6) length
and exclusivity of the mark's use." <u>Id.</u> (citation omitted).

Brooks has presented no evidence relating to four of these six factors.  With respect to the fourth and sixth factors, she has described several commercial licensing arrangements, has offered documentary evidence corroborating the existence of one of them, but has provided no evidence of any sales made to the public by the licensees.  While Brooks licensed Bell's name commercially on scattered occasions in 1993, 1994, 1996, and 2001, Brooks licensed the image of Bell at issue here on a single occasion.[13]  Given this record, no reasonable juror could find that "the public is moved in any degree to buy an article" displaying Bell's name or image based on the belief that it implies endorsement by his estate, Brooks, or by any unknown source.  Id.

Because Brooks has failed to raise a question of fact that either of the purported marks functions as an indicator of source or endorsement, Brooks's claim for false endorsement fails.  As a result, it is not necessary to reach the questions of whether Brooks has presented sufficient evidence of either her use of the marks in commerce to confer standing upon her or a likelihood of confusion.  See EMI Catalogue Partnership v. Hill, Holliday, Connors, Cosmopulos Inc., 228 F.3d 56, 62 (2d

---

[13] Brooks licensed the image of Bell used on the 2004 Topps cards to Upper Deck.  She licensed a different image of Bell to General Mills.  There is evidence that she licensed images of Bell to Rodrigues Studio and Crown Crafts, but there is no evidence identifying these images.

Cir. 2000) (holding that "general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)") (citing Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992)); Buti v. Perosa, S.R.L., 139 F.3d 98, 102 (2d Cir. 1998) (use in commerce); Louis Vuitton, 454 F.3d at 116 (Polaroid factors).

B.   False Advertising under Section 43(a)(1)(B)

A claim under § 43(a)(1)(B) for false advertising requires evidence of:  (1) standing, which requires both "a reasonable interest to be protected against the advertiser's false or misleading claims" and "a reasonable basis for believing that this interest is likely to be damaged by the false or misleading advertising,"[14] ITC, 482 F.3d at 169 (2d Cir. 2007) (citation omitted), and  (2) a "commercial advertisement or promotion" by the defendant, Gmurzynska v. Hutton, 355 F.3d 206, 210 (2d Cir. 2004) (citing 15 U.S.C. § 1125(a)(1)(B)), that contains (3) "false or misleading descriptions or representations of fact concerning 'the nature, characteristics, qualities, or

---

[14] "The reasonable interest prong of this test includes commercial interests, direct pecuniary interests, and even a future potential for a commercial or competitive injury.  The reasonable basis prong requires the plaintiff to show both likely injury and a causal nexus to the false advertising." ITC, 482 F.3d at 169-70 (citation omitted).

geographic origin of his or her or another person's goods, services, or commercial activities,'" <u>Societe des Hotels Meridien v. LaSalle Hotel Operating Partnership, L.P.,</u> 380 F.3d 126, 132 (2d Cir. 2004) (citing 15 U.S.C. § 1125(a)(1)(B)) (emphasis omitted); that is (4) material, <u>Time Warner Cable, Inc. v. DIRECTV, Inc.</u>, 497 F.3d 144, 153 n.3 (2d Cir. 2007) (citation omitted).

Commercial advertising or promotion requires:

(1) commercial speech, (2) made for the purpose of influencing consumers to buy defendant's goods or services, and (3) although representations less formal than those made as part of a classic advertising campaign may suffice, they must be disseminated sufficiently to the relevant purchasing public.

<u>Gmurzynska</u>, 355 F.3d at 210 (citation omitted).[15]  Commercial speech is "speech which does no more than propose a commercial transaction." <u>Id.</u>  The commercial speech requirement is intended to ensure that the Lanham Act does not encroach upon First Amendment rights.  <u>See</u> <u>Boule v. Hutton</u>, 328 F.3d 84, 91, 92 n.7 (2d Cir. 2003).

---

[15] Some circuits have also required that the defendant and plaintiff be competitors.  <u>Boule v. Hutton</u>, 328 F.3d 84, 91 (2d Cir. 2003); <u>Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.</u>, 314 F.3d 48, 56 (2d Cir. 2002) (collecting cases).  The Second Circuit has not decided whether this element is required but has noted that it is not found in the text of Section 43(a). <u>Gmurzynska</u>, 355 F.3d at 210.  In light of the analysis above, it is not necessary to reach this issue here.

Brooks identifies three statements as constituting false advertising. The first is the Nickname Statement, which appears on the 2001 cards. Summary judgment is granted on the false advertising claim to the extent it relies on the Nickname Statement since this statement is not commercial speech and therefore does not constitute commercial advertising or promotion. See Boule, 328 F.3d at 91; Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 57 (2d Cir. 2002).

The second statement is the Player Agreement Footnote. The record contains evidence, undisputed for purposes of this motion, that the Player Agreement Footnote was actually false, at least with respect to Bell. Consumer deception is therefore presumed with respect to that statement. See Time Warner Cable, 497 F.3d at 153. Nonetheless, a plaintiff must "demonstrate that the false or misleading representation involved an inherent or material quality" of either the plaintiff's or defendant's product. Id. at 153 n.3. In applying this standard, the Second Circuit has considered whether the false or misleading representation would be likely to influence consumers' purchasing decisions. Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 855 (2d Cir. 1997).

The Player Agreement Footnote refers to Topps's product, but the language that Brooks highlights, taken in context, is not material as a matter of law. Brooks has not presented

sufficient evidence that the statement in the footnote would be likely to encourage consumers to buy Topps's product on the mistaken belief that Bell agreed to provide his signature to Topps. Not only does Bell's name not appear on the 2004 promotional materials, but the statement is a disclaimer rather than a statement of the product's attributes. It reads, "Although these players have agreed to provide these cards [for/to] Topps, we cannot guarantee that all autographs [and/or memorabilia/relics] will be received in time for inclusion in this product." (Emphasis added). Moreover, the miniscule font in the footnote makes it highly unlikely that it would attract customers' attention. Brooks has simply failed to show that a reasonable juror could find that the Player Agreement Footnote is material in the context of the false advertising claim.

The third and final statement at issue in the false advertising claim is the Autograph Statement. The Autograph Statement is not literally false, and Brooks does not argue that the Bell signature on the Topps 2004 Signature Card is inauthentic. A false advertising claim that is not premised on an explicitly false statement must be supported by extrinsic evidence, usually a consumer survey, showing that consumers were deceived or confused by the defendant's statement. Time Warner Cable, 497 F.3d at 153; Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp., 960 F.3d 294, 297-98 (2d

22

Cir. 1992). Brooks has not presented such extrinsic evidence of customer confusion. Summary judgment is granted to Topps on the false advertising claim.

C. Common Law Unfair Competition

As the parties agree, New York common law unfair competition claims are analyzed in a manner similar to that used for Lanham Act claims. Louis Vuitton Malletier, 454 F.3d at 119. Brooks has not identified any theories of liability under state common law other than those discussed above. Her common law unfair competition claim fails for the same reason that her federal claims failed. Summary judgment is granted to Topps on the common law unfair competition claim.

CONCLUSION

For the foregoing reasons, Topps's motion for summary judgment is granted. The Clerk of Court shall close the case.

SO ORDERED:

Dated:    New York, New York
          December 21, 2007

                                    DENISE COTE
                                    United States District Judge

23